UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LONNIE JANES KERLEY, | No.  2:19-cv-02458 JAM GGH P |
| Petitioner, | |
| v. | CORRECTED FINDINGS AND RECOMMENDATIONS |
| RALPH DIAZ, Warden, | |
| Respondent. | |

*Introduction and Summary*

Petitioner, a state prisoner proceeding pro se, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. The matter was referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 626(b)(1) and Local Rule 302.

In a case which initially, it appears, could have come directly out of the script for a *Forensic Files* episode given the years it took to identify the victim, petitioner, a long time domestic abuser, was convicted of second degree murder and sentenced to 15 years to life imprisonment. Unlike *Forensic Files*, however, there were no eyewitnesses, very little, if any, forensic evidence linking Kerley to the murder; even the autopsy findings regarding cause of death of the victim were hotly disputed given the years it took to finally complete all the autopsies.  Nearly the entirety of the case was premised on prior bad acts which portrayed this

1

petitioner (and correctly so) as a brutal, serial domestic abuser. California law allows the jury to infer that petitioner killed the victim based on prior acts of sexual/domestic abuse misconduct (see infra footnotes 2, 3). In his habeas petition, petitioner brings issues of prejudicial propensity evidence, due process violation with admission of the victim's statements, jury instruction regarding an inference of consciousness of guilt lacking in evidentiary support, and an encore admission of prejudicial evidence issue.

For the reasons that follow, the undersigned recommends the petition be denied.

*Background Facts*

The California Court of Appeal for the First District (hereinafter "Court of Appeal") issued a lengthy, published opinion in this case, People v. Kerley, 23 Cal. App. 5th 513 (2018). The issues in this case do not require an extensive repetition of the opinion itself, so the undersigned will simply summarize the facts as set forth in the opinion with quoted snippets which exemplify the abuse and evidence at issue.

Petitioner had a long and violent relationship with the victim, Danna Dever (hereinafter "Dever" or "the decedent") commencing in the 1980s. Episodes of violence included, for example the kicking of Dever's pregnant stomach with steel toed boots. The record is replete with ongoing beatings, broken ribs, and the forced cutting of hair. In 1996, the police were called, and when they arrived, Dever yelled:

> " 'Help me, help me, save me, save me, he did this.' " Kerley was standing in the doorway, and Mandee was in the back of the room. Officer McCoy carried Dever to his patrol car and put her in the backseat. Dever told Officer Julie Cross that Kerley had "stomped her right hand and foot at the same time, and then he kicked her in her eye with his right foot." Dever said that, when she went to call 911, Kerley told her he would kill her if any police officers came to the house.

People v. Kerley, 23 Cal. App. 5th at 522.[1]

---

[1] See also People v. Kerley, 23 Cal. App. 5th at 521-522:

> Deborah M., another of Dever's sisters, testified that sometime before 1990, Dever called and asked Deborah to come over because she (Dever) was fighting with Kerley. Deborah arrived at Dever's apartment and witnessed Kerley kicking Dever, who was on the floor "crying and screaming." Deborah also saw Dever with "her

1    As is often the case, the victim, Dever, recanted her initial allegations, but the prosecution

2    refused to drop the case. Just before a scheduled appearance on June 19, 1996, Dever

3    disappeared. What turned out to be Dever's unclothed body (initially designated "Jane Doe No.

4    7" and only later identified as Dever a decade later) was found on July 8, 1996 in a dry creek bed,

5    partially covered by a blanket. Two forensic pathologists conducted separate investigations into

6    the cause of death of Jane Doe No. 7, opining that the cause of death was not apparent, and that it

7    did not appear that the chest cavity had been traumatized. The right hand was excised from the

8    body in case a fingerprint could later detail the identity of the victim. A fingerprint taken from the

9    right hand did not result in a disclosure of a specific person's identity.

10   At or about the same time, the Solano County District Attorney's office received an

11   anonymous letter referencing a "Danny's" inculpatory statements regarding Dever. The letter

12   contained details matching the above discussed finding of Dever's body. However, after forensic

13   examination, the writing of the letter (clearly disguised) could not be attributed to petitioner or his

14   mother.

15   A year later, investigators approached yet another forensic pathologist who was tasked

16   with finding a cause of death. This, time, after nearly a year's long analysis:

> Contrary to Dr. Peterson's testimony that he had removed the chest plate during the original autopsy, Dr. Murad testified that the chest plate had not been removed when he received the remains. Dr. Murad testified that he identified two fractures on the left first rib and the ninth right rib which had fully healed at the time of death, and one fracture on the right first rib that was in the process of healing at the time of death, meaning it had most likely been fractured six weeks or less before death.
>
> Dr. Murad also identified fractures on both the left and right side of ribs two through nine that occurred "perimortem," meaning "around the time of death." Dr. Murad also testified that the hyoid bone in the throat was fused on the right side but not the left side, and had been "displaced" and was "laying over on its side." Dr. Murad opined that the damage to the ribs was consistent with being beaten or "stomped" on the chest, and that the manner of death was a homicide.

26   People v. Kerley, 23 Cal. App. 5th at 525.

> face all bruised up," an eye that had been  "bludgeoned," and bruises on her back. Over the years, Dever left Kerley approximately five times and stayed with Deborah at her home.

3

1    The victim, however, remained unidentified. No new facts in the case of any significance

2    occurred in the case until April of 2006. At this time, the police determined from a neighbor that

3    petitioner had been digging in his backyard at the time of Dever's disappearance. When a

4    depressed area was dug up, the remains of a dog were found. However, of interest to this case,

5    items of women's clothing and other woman's items were also found.

6    A year later in April of 2007, another investigator was assigned to Dever's disappearance.

7    Another attempt at fingerprinting identification of Jane Doe No. 7 resulted in a successful match

8    to Dever. Petitioner remained a person of interest at this time and was questioned by police in

9    2007, but nothing of significance occurred until July of 2010 when a pubic hair, found in a car

10   petitioner owned prior to 1999, was associated with Dever. Thereafter, petitioner was arrested on

11   October 28, 2010, but not indicted until August 2, 2011.

12   Trial commenced afterwards, but the only significant evidence to be discussed in this

13   background section is that two defense forensic pathologists totally disagreed with Dr. Murad's

14   analysis:

> Haddix opined that Dever's cause of death and manner of death were both undetermined. [fn. 2 omitted]. Haddix also disagreed with Dr. Murad and opined that Dever's chest plate was removed as part of the initial autopsy, as reflected in the autopsy report. Haddix testified that Dever's hyoid bone was not damaged, but merely unfused on one side. Haddix explained that the hyoid bone has three parts, and as an individual grows older, the three parts fuse together. Haddix testified that Dever's hyoid bone was simply fused on one side but not the other, which was "very, very normal" and in no way indicative of a defect or a fracture.
>
> Dr. Allison Galloway, a forensic anthropologist, also examined Dever's remains in 2012, along with Dr. Haddix, on behalf of the defense. In forming her opinion, she reviewed the grand jury testimony, the autopsy report, and the reports of Charles Cecil and Dr. Murad. Dr. Galloway agreed with Dr. Haddix that there was no damage or fracture to Dever's hyoid bone; it was simply fused on one side and not the other, which she characterized as "absolutely normal." Dr. Galloway also opined that certain damage to Dever's ribs postdated her death and was consistent with removal of the chest plate as part of the autopsy, and that this was not even a "close call."

27   People v. Kerley, 23 Cal. App. 5th at 527.

28   Further facts will be given in the discussion sections below as deemed necessary.

*Issues Presented*

1. The Use of Abuse Propensity Evidence (Multiple Instances of Abuse by Petitioner);

2. Use of Two of Dever's Statements violated Petitioner's Right to Confrontation; Has Any Federal Claim Been Set Forth;

3. The Consciousness of Guilt Instruction Violated Due Process Because There Was No Evidentiary Link of Evidence Manipulation by Petitioner; and

4. Whether Admission of Evidence Regarding Petitioner's Proclivity for Three Person Sex (Dever Was To Secure One of the Participants) Violated Due Process.

*Discussion*

A. <u>Admission of Prior Acts of Misconduct</u>

Petitioner contests the admission into evidence through proof of prior acts of misconduct his lengthy history of savaging his long time live-in partner, the decedent in this case.[2] These

---

[2] Cal. Evid. Code § 1109 provides:

> (a)(1) Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352.
>
> (2) Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving abuse of an elder or dependent person, evidence of the defendant's commission of other abuse of an elder or dependent person is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352.
>
> (3) Except as provided in subdivision (e) or (f) and subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, in a criminal action in which the defendant is accused of an offense involving child abuse, evidence of the defendant's commission of child abuse is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352. Nothing in this paragraph prohibits or limits the admission of evidence pursuant to subdivision (b) of Section 1101.
>
> (b) In an action in which evidence is to be offered under this section, the people shall disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, in compliance with the provisions of Section 1054.7 of the Penal Code.

voluminous acts are detailed in <u>People v. Kerley</u>, 23 Cal. App. 5th at 521-523; 534-535; 538-539; 544-546; 551-553. There is no doubt that the admission of the evidence concerning the multiple acts of violence and degradation petitioner visited upon Dever was critical evidence due to the highly contested expert evidence on the decedent's cause of death.[3]  There is further no doubt that

(c)  This section shall not be construed to limit or preclude the admission or consideration of evidence under any other statute or case law.

(d)  As used in this section:

(1)  "Abuse of an elder or dependent person" means physical or sexual abuse, neglect, financial abuse, abandonment, isolation, abduction, or other treatment that results in physical harm, pain, or mental suffering, the deprivation of care by a caregiver, or other deprivation by a custodian or provider of goods or services that are necessary to avoid physical harm or mental suffering.

(2)  "Child abuse" means an act proscribed by Section 273d of the Penal Code.

(3)  "Domestic violence" has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, "domestic violence" has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense.

(e)  Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice.

(f)  Evidence of the findings and determinations of administrative agencies regulating the conduct of health facilities licensed under Section 1250 of the Health and Safety Code is inadmissible under this section.

[3] A California jury may infer from evidence of prior acts of domestic abuse that the defendant therefore had a propensity to commit the acts which led to a victim's demise or other serious criminal act.  <u>People v. Jennings</u>, 81 Cal. App. 4th 1301, 1318-19 (2000):

Thus, the instruction would have specifically pointed out to the jury that the evidence of appellant's prior acts of domestic abuse against the victim could be used as evidence that " '... he has a trait of character that predisposes him to commission of certain crimes, ...' " and moreover that the jury could " '... use that evidence that [he] committed another offense for the limited purpose of deciding whether he has a particular character trait that tends to predispose him to the commission of the charged offense. ...' " (*Fitch, supra,*

if this evidence was improperly admitted, the admission would have had a substantial and injurious effect on the guilty verdict. Petitioner's problem in this case, governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), is twofold: 1) the Supreme Court has not held that the erroneous admission of overtly prejudicial evidence is a due process violation; and 2) the Ninth Circuit has expressly endorsed its admission in cases involving sexual misconduct.

////

---

> 55 Cal. App. 4th at p. 182, fn. 4, 63 Cal.Rptr.2d 753, italics added.) The same is true of the 1999 revision of CALJIC No. 2.50.02, which tells the jury that the evidence of prior domestic violence offenses could be relevant to an inference the defendant had a disposition to commit acts of domestic violence, and "was likely to commit and did commit the crime of which he is accused." (CALJIC No. 2.50.02 (1999 rev.).)

Cal. Jury Instr.—Crim. (CALJIC) 2.50.02 (2016 Revision) provides:

> In determining whether defendant has been proved guilty of [the] [any] crime of domestic violence of which [he] [or] [she] is charged, you should consider all relevant evidence, including whether defendant committed any other domestic violence crime[s] [, whether charged or uncharged,] about which evidence has been received. [The crime[s] charged in Count[s]_____, may be considered by you in that regard.]

> ***

> [Evidence of [an] uncharged crime[s] involving domestic violence has been received. If you find by a preponderance of the evidence that [the] [a] defendant committed any such uncharged offense involving domestic violence, you may, but are not required to, infer that [the] [a] defendant had a disposition to commit [another] [other] offense[s] involving domestic violence. If you find that [the] [a] defendant had this disposition, you may, but are not required to, infer that [he] [or] [she] was likely to commit and did commit the crime [or crimes] of which [he] [or] [she] is accused.

> However, even though you find by a preponderance of the evidence that the defendant committed [another] [other] uncharged crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that [he] [or] [she] committed the offense[s] you are determining. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether [the] [a] defendant has been proved guilty beyond a reasonable doubt of the charged crime that you are determining.]

7

1    The factual introduction in this Findings and Recommendations indicates the nature of the

2    prior misconduct alleged here. See also People v. Kerley, 23 Cal. App. 5th at 521-523; 534-535;

3    538-539; 544-546; 551-553.  There is no need to repeat here the precise contours of each and

4    every prior act of misconduct because regardless, no U.S. Supreme Court case exists to prohibit

5    its admission.

> Under AEDPA, even clearly erroneous admissions of evidence that
> render a trial fundamentally unfair may not permit the grant of
> federal habeas corpus relief if not forbidden by "clearly established
> Federal law," as laid out by the Supreme Court. 28 U.S.C. §
> 2254(d). In cases where the Supreme Court has not adequately
> addressed a claim, this court cannot use its own precedent to find a
> state court ruling unreasonable. *Musladin*, 549 U.S. at 77.
>
> The Supreme Court has made very few rulings regarding the
> admission of evidence as a violation of due process. Although the
> Court has been clear that a writ should be issued when
> constitutional errors have rendered the trial fundamentally unfair,
> *see Williams*, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a
> clear ruling that admission of irrelevant or overtly prejudicial
> evidence constitutes a due process violation sufficient to warrant
> issuance of the writ. Absent such "clearly established Federal law,"
> we cannot conclude that the state court's ruling was an
> "unreasonable application." *Musladin*, 549 U.S. at 77, 127 S.Ct.
> 649. Under the strict standards of AEDPA, we are therefore without
> power to issue the writ on the basis of Holley's additional claims.

17   Holley v. Yarborough, 568 F.3d 1091, 1101 fn. 2 (9th Cir. 2009) (emphasis added) (noting that if

18   it were free to rule on the issue, the Ninth Circuit would have found a violation of due process).

19        See also Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008); Alberni v. McDaniel, 458

20   F.3d 860, 866 (9th Cir. 2006); Soojian v. Lizarraga, Case No. 1:16-cv-00254-AWI-SAB-HC,

21   2018 WL 3155617 (E.D. Cal. June 25, 2018); Jones v. Spearman, Case No. 16-cv-03627-JD,

22   2018 WL 424402, at *4 (N.D. Cal. Jan. 16, 2018); Garcia v. Madden, Case No. EDCV 17-0049-

23   DOC (JDE), 2018 WL 910184, at *15 (C.D. Cal. Jan. 5, 2018).

24        Holley and its progeny did not hold that if the court believes a serious due process

25   violation exists, it is free to rule on the issue of admission of prejudicial evidence. "Without

26   power to rule" means just that— it does not mean "sometimes has the power to rule and

27   sometimes not." Moreover, the mere characterizing of a prejudicial evidence claim as a

28   fundamentally unfair "due process" violation would render the Holley rule useless, i.e., the claim

8

1    of admission of prejudicial evidence would be reviewed on the merits, regardless, every time.

> 2    Zapien also argues that the admission of Perez's statements was
> 3    such an egregious violation of California evidentiary law that it constituted a due process violation. It is not at all clear that there
>      was a violation of California law, let alone one so fundamentally
> 4    unfair that it amounted to a due process violation. In any event,
>      we've held that, "[u]nder AEDPA, even clearly erroneous
> 5    admissions of evidence that render a trial fundamentally unfair may
>      not permit the grant of federal habeas corpus relief if not forbidden
> 6    by clearly established [Supreme Court precedent]." Holley v.
>      Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal
> 7    quotation marks omitted).

8    Zapien v. Davis, 849 F.3d 787, 792 (9th Cir. 2015).

9    Thus, it does not matter whether the evidence analysis of the Court of Appeal was spot on,

10   dubious, or unreasonable. No cognizable federal claim exists. Petitioner could cite Dawson v.

11   Delaware, 503 U.S. 159 (1992) for the proposition that overtly prejudicial evidence may be a due

12   process violation. However, the difference between Dawson and the instant case, as well as the

13   cases cited above, is that the Aryan Brotherhood evidence introduced in Dawson was totally

14   irrelevant as well as prejudicial. Dawson found the due process violation because of the lack of

15   relevance, not simply because it was prejudicial. Petitioner does not contest the relevance of the

16   evidence herein—just that it was prejudicial. Relevance makes all the difference as to whether

17   one can state a federal claim in habeas involving the admission of prejudicial evidence.

18   Moreover, the issue is not just "propensity evidence" versus "due process."  A sea change

19   in evidence law has occurred transforming the formerly all encompassing "do not admit"

20   propensity evidence, with limited exceptions, see McKinney v. Rees, 993 F.2d 1378 (9th Cir.

21   1993), to a nearly no holds barred admission of propensity evidence in sexual assault, domestic

22   abuse or pedophile cases. Cal. Evid. Code § 1109 (see fn. 3 supra.; United States v. LeMay, 260

23   F.3d 1018 (9th Cir. 2001)). [4] While one can question "what changed" in terms of due process, i.e.,

24   what was once unfair becomes "fair," legislatures make known the policy of the times, and it is

25   ////

26

27

28

---

[4] The only check on carte blanche admission is whether the prejudice of the prior acts evidence outweighs the probative value. Cal. Evid. Code § 352; Fed. R. Evid. 403.  However, in practice, the more serious the prior misconduct and the more serious the charged crime, admission of the evidence will almost always have a greater probative value than prejudice.

1    difficult for courts from a policy standpoint to tell legislatures "they got it wrong." At least, a

2    lower court may not do so in an AEDPA case without direction by the Supreme Court.[5]

3          Accordingly, petitioner's propensity evidence claim must fail. The undersigned

4    recommends this claim be denied.

5          B.   Did the Admission of Two of the Decedent's Previous Testimonial Statements Violate

6               the *Crawford* Confrontation Rule; Has Petitioner Raised Any Federal Claim

7          It is important, and ultimately dispositive to define the precise issue which petitioner has

8    raised. He does not contest *in this petition*, on any *substantive* basis, those statements of the

9    decedent which the Court of Appeal found to be non-testimonial, and thus not subject to

10   Crawford v. Washington, 541 U.S. 36 (2004).  Petitioner only formally contests the admission of

11   two statements which the Court of Appeal found testimonial and that an exception to the

12   Crawford rule was applicable,  ECF No. 1 at 7; 25-34, and then only on the grounds that *state*

13   *procedural law* for the introduction of  "forfeiture by wrongdoing" was not satisfied.

14         Before delving into the precise issues raised by petitioner, a little substantive and

15   procedural background is necessary. Crawford held that the old Ohio v. Roberts rule[6] which

16   permitted the admission of the statement of an unavailable witness if it was rooted in an

17   established hearsay exception and had indicia of trustworthiness, was abrogated in favor of a rule

18   that the testimonial statements of an unavailable witness, who had not been subject to previous

19   cross-examination, were inadmissible. Very few rules are absolute, however, and an exception to

20   Crawford occurs when the party aggrieved by the admission of an out-of-court, non-cross-

21   examined testimonial statement had procured the unavailability of the witness who made the

22   testimonial statement, the "forfeiture by wrongdoing" exception. Giles v. California, 554

23   U.S.353, 358 (2008).[7]

24   _____

25   [5] The new way of looking at prior misconduct in sex assault or domestic abuse cases has not
     deterred courts from finding error in admitting prior misconduct in "ordinary" crime cases. See,
26   e.g., United States v. Bailey, 696 F.3d 794 (9th Cir. 2012); United States v. Santini, 656 F.3d
     1075 (9th Cir. 2011); United States v. Carpenter, 923 F.3d 1172, 1182 (9th Cir. 2019).
27   [6] Ohio v. Roberts, 448 U.S. 56 (1980).
     [7] The Giles "exception" was permitted, not because courts presently have the right to create
28   exceptions to the Sixth Amendment, but because such an exception was in play at the time the

                                          10

1    On appeal from his conviction, petitioner raised several procedural and substantive

2  reasons why hearsay statements violated petitioner's federal constitutional right to confront

3  witnesses. As seen in <u>People v. Kerley</u>, "Kerley argues the trial court violated *Crawford, supra*,

4  541 U.S. 36, 124 S.Ct. 1354 by admitting over his objection testimonial statements Dever made

5  to police officers on two occasions, December 24, 1989 and January 7, 1996." <u>People v. Kerley</u>,

6  23 Cal. App. 5th at 544. The Court of Appeal went on to analyze both what it found to be non-

7  testimonial prior statements of the deceased, and two statements which were found to be

8  testimonial.  After a lengthy recitation of the applicable law, the appellate court found statements

9  made to the police when they first arrived on the scene were non-testimonial; however, a formal

10  statement later given in each situation was found to be testimonial.

11    The Court of Appeal then undertook a lengthy analysis of whether California's procedural

12  law regarding a foundation for prior acts of sexual misconduct/domestic abuse had been satisfied.

13  <u>People v. Kerley</u>, 23 Cal. App. 5th at 544-556. The ultimate finding was that the trial judge had

14  done enough, although it appears to have been phrased in an after-the-fact manner: "Based on the

15  information contained in the People's proffer alone, the trial court easily could have found Kerley

16  killed Dever with the intent to prevent her from reporting his abuse to police and from testifying

17  against him in his upcoming criminal case."  <u>Id.</u> at 556. The appellate court went on to find on the

18  merits that the <u>Giles</u> exception to <u>Crawford</u> was applicable.

19    On petition for review in the California Supreme Court, ECF No.18-34 at 4, the headlined

20  issue was the following:

21         MAY A REVIEWING COURT ADMIT HEARSAY
          STATEMENTS BY THE DECEDENT UNDER THE
22         FORFEITURE BY WRONGDOING DOCTRINE CODIFIED IN
          EVIDENCE CODE SECTION 1390, WHERE NO REQUISITE
23         FOUNDATIONAL HEARING WAS CONDUCTED, THE TRIAL
          COURT NEVER RULED ON FORFEITURE BY
24         WRONGDOING AND NEVER MADE THE REQUIRED
          FINDINGS UNDER SECTION 1390, AND THE STATE NEVER
25         SOUGHT ADMISSION UNDER THAT PROVISION?

26  ////

27  ////

28  Sixth Amendment came into existence.

1   The argument made for this claim at ECF No. 18-34 at 31-38 *entirely* concerns the asserted

2   procedural defects with an ending tag line that petitioner's federal due process rights were

3   therefore violated, citing Estelle v. McGuire, 502 U.S. 62, 70 (1991).

4       In the federal petition filed in this case, petitioner briefed this issue (Ground 2 in the

5   Petition, ECF No. 1 at 7), with an identical cut and paste from the Petition for Review, ECF No. 1

6   at 26-34.[8]  The Traverse, ECF No. 21, in this case made no substantive argument whatsoever on

7   this claim, and limited its discussion to the "propensity evidence" issue.

8       The only issue before this court, therefore, is the procedural issue asserted in the Petition

9   for Review. Petitioner does not take issue with the analysis in the Court of Appeal opinion

10  between testimonial and non-testimonial statements, nor the ultimate finding that the Giles

11  exception to Crawford was satisfied. Petitioner proffers *no* argument that fact finding by the

12  Court of Appeal as to whether the Giles exception applied was objectively unreasonable. Instead,

13  petitioner's entire argument concerns the alleged usurpation by the appellate court of a

14  foundational hearing required of the trial courts by California law.

15      The undersigned may not raise substantive issues concerning Crawford and Giles when no

16  such issue has been raised by petitioner.  The U.S. Supreme Court has recently found that courts

17  may not introduce issues not properly raised by the parties. United States v. Sineneng-Smith, 140

18  S. Ct. 1575 (2020); Dep't of Homeland Sec. v. Thuraissigiam, 140 S. Ct. 1959, 1975 (2020).

19  Although the undersigned is surely tasked with liberally reading a pro se's briefing, see Haines v.

20  Kerner, 404 U.S.519 (1972), the undersigned may not arrogate to himself the raising of an issue,

21  never raised, and then deciding what the issue's resolution is—in essence, becoming the advocate

22  ////

23  ////

24  ───────────────────

25  [8] The Petition for Review, and hence the Petition here, did at one point indicate that an argument had been made in the Court of Appeal that, assuming arguendo that the Court of Appeal could

26  make the necessary Section 1390 findings, such a finding was not supported by the preponderance of the evidence, ECF No. 1 at 28.  However, no such argument was ever made in

27  any way, shape or form whatsoever in the Petition for Review/Petition.  Moreover, because there is no federal issue regarding application of Cal. Evidence Code Sec. 1390, see infra, whether the

28  Court of Appeal got the state law question right or wrong is immaterial.

1   or *amicus curiae* for one party. This issue raising prohibition applies in this case. Accordingly,

2   the only issue raised here is whether the procedural explanation of the Court of Appeal (presumed

3   adopted by the silent denial of the Petition for Review) violated due process.

4         Turning to this procedural issue, the case cited by petitioner, <u>Estelle v. McGuire</u>, <u>supra</u>,

5   actually stands for the opposite conclusion that petitioner would have this court reach. The

6   Supreme Court took pains to explain that the Circuit Court's explication of state law at odds with

7   the California courts was not permitted in federal habeas corpus.

> In ruling that McGuire's due process rights were violated by the admission of the evidence, the Court of Appeals relied in part on its conclusion that the evidence was "incorrectly admitted ... pursuant to California law." *Id.*, at 754. Such an inquiry, however, is no part of a federal court's habeas review of a state conviction. We have stated many times that "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990); see also *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874–75, 79 L.Ed.2d 29 (1984). Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21, 96 S.Ct. 175, 177, 46 L.Ed.2d 162 (1975) (per curiam ).

16   <u>Estelle</u>, 502 U.S. at 67-68.

17         There could be little that is not more a matter of state law than foundational procedures for

18   the admission of evidence. While it may be possible for a state procedure to be so defective as to

19   violate due process, the defect must be one that the Supreme Court has found to be a watershed

20   requirement of due process. Such is not the case here. AEDPA requires that the Supreme Court

21   make a pronouncement that a state law determination violates the Constitution and the

22   undersigned is unaware of any procedural, foundational hearing prerequisites required by

23   <u>Crawford</u> or <u>Giles</u>, or subsequent *Supreme Court* cases.  <u>Compare</u> <u>Parker v. Matthews</u>, 567 U.S.

24   37, 48-49 (2012), <u>and</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 100 (2011), <u>with</u> <u>Tracy v. Palmateer</u>,

25   341 F.3d 1037, 1044 (9th Cir. 2003) (explicating Supreme Court cases and finding a trial court

26   hearing is often, but not always, required for juror bias issues). Petitioner's claim fails to state a

27   federal claim. Accordingly, the undersigned recommends this claim be denied.

28   ////

C.   Unsupported Instruction on Inference of Guilt

Given the lack of direct evidence demonstrating that petitioner murdered his domestic partner, the conceded error of instructing the jury that it could draw an inference of petitioner's guilt because petitioner's mother had sent the police a letter identifying a fictitious person as the murderer, had the potential for real harm. The Court of Appeal's analysis is set forth below:

> Kerley argues that the trial court erred by instructing the jury pursuant to CALCRIM No. 371, which provides: "If someone other than the defendant tried to create false evidence, provide false testimony, or conceal or destroy evidence, that conduct may show the defendant was aware of his guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions. It is up to you to decide the meaning and importance of this  evidence. However, evidence of such conduct cannot prove guilt by itself."

> The prosecution sought this instruction on the theory that Kerley's mother had written the anonymous letter to the police suggesting that Dever's killer was a man named "Danny" in an attempt to draw suspicion away from her son. Kerley argues that it was error to give the instruction because no evidence supports the inference that Kerley's mother wrote the letter or that she did so in Kerley's presence or with his authorization.

> "Whether or not any given set of facts may constitute suppression or attempted suppression of evidence from which a trier of fact can infer a consciousness of guilt on the part of a defendant is a question of law. ... [T]here must be some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference. Furthermore, the determination of whether there is such evidence in the record is a matter which must be resolved by the trial court before such an instruction can be given to a jury." ( *People v. Hannon* (1977) 19 Cal.3d 588, 597–598, 138 Cal.Rptr. 885, 564 P.2d 1203 ( *Hannon* ), disapproved on other grounds in *People v. Martinez* (2000) 22 Cal.4th 750, 762–763, 94 Cal.Rptr.2d 381, 996 P.2d 32.) As relevant here, the evidence need not conclusively establish fabrication by others or defense authorization of the fabrication before the instruction may be given; " 'there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference.' " ( *People v. Alexander* (2010) 49 Cal.4th 846, 921, 113 Cal.Rptr.3d 190, 235 P.3d 873.)

> On appeal, the People argue that there was sufficient evidence to support the instruction. In support of the inference that Kerley's mother sent the letter, the People point to Kerley's mother's testimony that she never witnessed domestic violence or saw Dever with injuries as evidence that Kerley's parents were willing to lie to protect him. The People also suggest that because Kerley's parents were present at Kerley's house the morning Dever disappeared, they may have been involved with covering up the crime.

14

According to the People, because the letter "was intended to deflect suspicion away from [Kerley] with false assertions," and because Kerley did not write the letter himself, the jury could reasonably conclude that Kerley authorized or was involved with the letter's creation.

We agree with Kerley that the evidence was insufficient to support an inference that he authorized or was present for the writing of the letter. However, we conclude that the error was rendered harmless by the balance of the instruction. The jury was instructed that an adverse inference of consciousness of guilt was permissible only if it first found "someone other than [Kerley] tried to create false evidence [or] provide false testimony," and then "only if [Kerley] was present and knew about that conduct, or, if not present, authorized the other person's actions." The jury was further instructed to "decide the meaning and importance of this evidence" and cautioned that "evidence of such conduct cannot prove guilt by itself." Elsewhere, the jury was instructed that some instructions might not apply, depending upon its determination of the facts, and it should follow the instructions that applied to the facts as it found them. We presume the jury understood and followed these instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662, 15 Cal.4th 1385A, 662, 63 Cal.Rptr.2d 782, 937 P.2d 213.) At worst, there was no evidence to support the instruction and it was superfluous. (*See People v. Nunez and Satele* (2013) 57 Cal.4th 1, 48–49, 158 Cal.Rptr.3d 585, 302 P.3d 981 [if evidence did not support consciousness of guilt instruction, "we presume that the jury concluded that the instructions did not apply to him and it should not infer a consciousness of his guilt"]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1225, 56 Cal.Rptr.2d 49, 920 P.2d 1254 [any error in giving instruction on fabrication of evidence was harmless because " '[a]t worst, there was no evidence to support the instruction and ... it was superfluous' " (quoting *People v. Pride* (1992) 3 Cal.4th 195, 249, 10 Cal.Rptr.2d 636, 833 P.2d 643) ]; *Crew, supra*, 31 Cal.4th 822, 849, 3 Cal.Rptr.3d 733, 74 P.3d 820 [similar].) Given the voluminous evidence in this lengthy trial, and the limitations and cautions built into the instruction itself as discussed above, we conclude that " '[u]nder the circumstances, reversal on such a minor, tangential point is not warranted.' " (*People v. Jackson, supra*, 13 Cal.4th at p. 1225, 56 Cal.Rptr.2d 49, 920 P.2d 1254.)

People v. Kerley, 23 Cal. App. 5th at 565-567.

The undersigned has some difficulty with the initial determination that the instruction was a "minor" glitch in an otherwise overwhelming case. A reasonable jury might expect that the instruction was given for a valid reason, and it is not possible to know whether it played a large role in their determination, or little at all.  In the former situation, an inference of guilt based on the submission of false evidence is just a small step below a direct confession to the crime.  An innocent person does not have sent, on one's behalf, letters fabricating the ultimate perpetrator

1   out of the blue.  Rather, it depicts the mindset of a defendant who has knowledge of his own guilt

2   and is attempting to deflect the police to another suspect.  If this instruction was not harmful, why

3   not have an instruction, in the absence of evidence, that the jury could, but did not have to, infer

4   guilt because the defendant fled and hid himself.  According to the Court of Appeal, the jury

5   could always figure out that the instruction was not supported by the evidence.

6          A permissive inference instruction violates the Constitution if there are no or insufficient

7   facts to warrant it having been given to the jury:

> The most common evidentiary device is the entirely permissive inference or presumption, which allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant. See, *e. g.*, *Barnes v. United States, supra*, 412 U.S., at 840 n. 3, 93 S.Ct., at 2360 n. 3. In that situation the basic fact may constitute prima facie evidence of the elemental fact. See, *e. g.*, *Turner v. United States*, 396 U.S. 398, 402 n. 2, 90 S.Ct. 642, 645, n. 2, 24 L.Ed.2d 610. When reviewing this type of device, the Court has required the party challenging it to demonstrate its invalidity as applied to him. E. g., *Barnes v. United States, supra*, 412 U.S., at 845, 93 S.Ct., at 2362; *Turner v. United States, supra*, 396 U.S., at 419–424, 90 S.Ct., at 653–656. See also *United States v. Gainey*, 380 U.S. 63, 67–68, 69–70, 85 S.Ct. 754, 757–758, 758–759, 13 L.Ed.2d 658. Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the "beyond a reasonable doubt" standard *only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference. For only in that situation is there any risk that an explanation of the permissible inference to a jury, or its use by a jury, has caused the presumptively rational factfinder to make an erroneous factual determination.*

20   Cty. Court of Ulster Cty., N. Y. v. Allen, 442 U.S. 140, 157 (1979) (emphasis added).

21          See also Francis v. Franklin, 471 U.S., 307, 314-315 (1985)) (Holding a permissive

22   inference instruction is constitutional unless "the suggested conclusion is not one that reason and

23   common sense justify in light of the proven facts before the jury."); Hanna v. Riveland, 87 F.3d

24   1034, 1037 (9th Cir. 1996) (Holding that permissive inference jury instructions are constitutional

25   "so long as it can be said with substantial assurance that the inferred fact is more likely than not to

26   flow from the proved fact on which it is made to depend.")

27          Thus, if we apply the very words of Ulster, an error of constitutional magnitude occurred.

28   No one contests the fact that the permissive instruction was given in the absence of evidence, i.e.,

1  "under the facts of the case, there is no rational way the trier of fact could make the connection

2  permitted by the inference." Respondent's initial contention that the error here only involved a

3  matter of state law is not correct—nor was it minor or tangential. [9]

4    The constitutional violation here is subject to a harmless error analysis.  See Rose v.

5  Clark, 478 U.S. 570, 581-582 (1986) (Held even Sandstrom error (mandatory presumption) is

6  subject to harmless review).  On federal habeas review of state court findings of non-structural

7  constitutional error, the harmless error standard of Brecht v. Abrahamson, 507 U.S. 619 (1993),

8  applies. The question is whether the error had substantial and injurious effect or influence in

9  determining the jury's verdict and resulted in "actual prejudice." See Brecht, 507 U.S. at 637; Fry

10  v. Pliler, 551 U.S. 112, 120 (2007). Because the Brecht standard "obviously subsumes" the more

11  liberal AEDPA/Chapman standard, the Ninth Circuit has held "we need not conduct an analysis

12  under AEDPA of whether the state court's harmlessness determination on direct review...was

13  contrary to or an unreasonable application of clearly established federal law." Pulido v. Chrones,

14  629 F.3d 1007, 1012 (9th Cir. 2010) (citing Fry, 551 U.S. at 120). See also Ortiz v. Yates, 704

15  F.3d 1026, 1038; n. 9 (9th Cir. 2012).  Instead, a federal habeas court is to apply the Brecht test

16  without regard for the state court's harmlessness determination. Pulido, 629 F.3d at 1012 (citing

17  Fry, 551 U.S. at 121–22); see also Merolillo v. Yates, 663 F.3d 444, 454–55 (9th Cir. 2011)

18  (Applying " 'the Brecht test without regard for the state court's harmlessness determination.' ")

19    The Supreme Court has since clarified that Brecht incorporates the requirements of §

20  2254(d) (AEDPA). Davis v. Ayala, 576 U.S. 257, 269-270. Accordingly, if a state court has

---

[9] With respect to federal error asserted, the situation is different for this claim as it was for Claim 2 in Section B above (regarding a state procedural issue).  The case relied upon by petitioner, People v. Hannon, 19 Cal. 3d 588, 597-598 (1977), mirrored the Ulster holding.  "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. (People v. Carmen (1951) 36 Cal.2d 768, 773, 228 P.2d 281.) …. Thus in order for a jury to be instructed that it can infer a consciousness of guilt from suppression of adverse evidence by a defendant, there must be some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference."  Just as in Early v. Packer, 537 U.S. 3, 8 (2002), which allows the application of AEDPA even though federal authority is not cited, so too can petitioner raise a federal claim which is mirrored by the state law. Moreover, there is no argument here by respondent that the federal claim has not been exhausted.

1  determined that a trial error was harmless, "a federal court may not award habeas relief under §

2  2254(d) *unless the harmlessness determination itself* was unreasonable." Id. at 269 (quoting Fry,

3  551 U.S. at 119) (emphasis in original). "[R]elief is proper only if the federal court has 'grave

4  doubt about whether a trial error of federal law had substantial and injurious effect or influence in

5  determining the jury's verdict.' " Davis, 576 U.S. at 267-268 (quoting O'Neal v. McAninch, 513

6  U.S. 432, 436 (1995)). The Brecht test will be applied here, but "with due consideration of the

7  state court's reasons for concluding the error was harmless beyond a reasonable doubt." Jones v.

8  Harrington, 829 F.3d 1128, 1141-42 (9th Cir. 2016).

9  As indicated above, the undersigned cannot agree with the entirety of the Court of

10  Appeal's harmlessness analysis. The instruction presumes that at least *some evidence* of the

11  defendant's involvement in the deception was present in the record and the jury was to decide

12  what to believe.  Thus, it is not sufficient to simply speculate that the jury will determine the issue

13  correctly in the absence of evidence, and decide that the instruction was superfluous because no

14  evidence was introduced to base the instruction upon. As indicated above, such reasoning would

15  permit any consciousness of guilt instruction to be introduced in the absence of evidence to

16  support it in the hope that the jury would ultimately understand in circumstances similar to the

17  present case that no evidence existed even upon which to base its issuance. If the jury believed

18  that petitioner was hiding his guilt by affirmatively attempting to throw the police off the correct

19  course, such a conclusion is not insignificant in almost any case.

20  However, the outcome here is not based simply on the undersigned's analysis that a

21  potential inference of petitioner's guilty mind is problematic here, but whether the Court of

22  Appeal analysis also determined that given the entirety of the evidence in the case, the error was

23  not sufficiently important to warrant reversal. Given the fact that the prior misconduct evidence

24  was so pervasive, and presumably correctly admitted, the undersigned cannot find the Court of

25  Appeal to be AEDPA unreasonable in its determination that the consciousness of guilt evidence

26  played an insubstantial role in petitioner's conviction. In other words, the Court of Appeal was

27  not unreasonable in finding that the jury, after listening to all the evidence about the decedent's

28  beatings/threats at the hands of petitioner, would have come to the same conclusion of guilty—

18

1    whether or not the permissive inference instruction had been given. Unreasonableness in the

2    AEDPA sense is that reasonable jurists could not come to the same conclusion as the Court of

3    Appeal—a daunting challenge for petitioner in habeas corpus.

4         Accordingly, the undersigned recommends this claim should be denied.

5         D.  Whether The Testimony of a Prosecution's Witness Relating, In Part, Petitioner's

6         Proclivity for Multiple Sex Partners Violated Due Process

7         The by now heavily laden Holley v. Yarborough—no-federal-claim-regarding-admission-

8    of-prejudicial-evidence—train is asked to take on a bit more freight for this issue. The issues in

9    the state courts involved the admission of evidence which included petitioner's proclivity for

10   three person sex. A subsidiary issue in state court, which involved a request for mistrial due to the

11   sexually charged evidence, is made here as well, but rises and falls with the admission issue. The

12   Court of Appeal first set the background for this claim in its Section III discussion regarding

13   propensity evidence in general:

14             On the other hand, evidence that Kerley demanded that Dever

15             procure a woman with whom they could have sex, and his prior
               conduct of holding a gun to Trudy's head during their sexual

16             encounters, was the type of "undue prejudice" to which section 352
               applies. Kerley's sexual deviance, and his use of a firearm in

17             pursuit of these sexual desires, do not tend to prove that Kerley was
               likely to beat Dever. Therefore, they carried no probative value on a

18             relevant issue, but did introduce unduly prejudicial evidence against
               Kerley. The question is whether this portion of the evidence, in the

19             context of the trial as a whole, was likely to cause the jury to
               convict Kerley of murder based on its emotional reaction to his

20             deviant sexual desires rather than on the evidence that Kerley
               assaulted Dever and caused her death. We address this issue in part

21             XII below.

22   People v. Kerley, 23 Cal. App. 5th at 540; see also id. at 522 (the December 1989 Incident).

23                      XII. There Was No Cumulative Error

24             We have concluded that the trial court erred in admitting Dever's
               statement that the reason Kerley kicked her in the head in 1989 was

25             because she failed to procure a woman for three-way sex after
               Trudy declined to participate due to Kerley's violent tendencies.

26             Although this evidence was prejudicial, its admission—in light of
               the extensive evidence of Kerley's violent treatment of Dever—was

27             not likely to have had a significant impact on the jury.

28   Id. at 574.

1    Again, the admission of prejudicial evidence does not state a federal claim. See Section A,

2    supra.  But even if this were not the case for this issue, the Court of Appeal was demonstrably

3    correct that this type of evidence was insubstantially prejudicial. First, one can validly ask

4    whether this type of sexual activity is now so far out of the main as to constitute shocking

5    evidence to a jury in the year 2020.  Moreover, the shocking part, the part which the Court of

6    Appeal held admissible, was set forth in the police encounter in December 1989 and decedent's

7    statement to the police:

8               On December 24, 1989, at around 1:00 a.m., Fairfield Police
             Officer Caree Harper responded to a call reporting a disturbance at
9               the Oakbrook residence. When Officer Harper arrived, she heard
             Dever screaming "Trudy, Trudy" very loudly. As Dever continued
10              screaming, another officer who had arrived knocked on the door.
             Kerley opened the door, said, " 'Everything is fine,' " and quickly
11              slammed it shut again. Dever continued to scream, and Officer
             Harper and the other officer broke a window in order to pull Dever
12              out of the house. Dever was "hysterical, frantic, scared [and]
             panicked," and told the officers, " 'Hurry, I know he's going to kill
13              me.' " Dever was taken to the police station, where she gave a
             statement. Dever told Officer Harper that Kerley had beaten her
14              because she failed to find a woman with whom she could have sex
             while Kerley watched. Dever said that Trudy had engaged in sex
15              with them before, but she refused to do so again because Kerley had
             held a gun to her head and was too violent. Officer Harper
16              photographed Dever's injuries, which included a one-inch cut
             above her left eye and a bruise on her thigh.

17

18   People v. Kerley, 23 Cal. App. 5th at 522.

19             The violence exhibited by the decedent's "failure to perform her mission at petitioner's

20   bidding" is the shocking part, but which was admissible along with the other shocking beatings.

21   The sexual part of the incident pales in comparison to the beating.  The claim here is

22   insubstantial.

23             Accordingly, the undersigned recommends this claim be denied.

24   *Certificate of Appealability*

25             Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must

26   issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  A

27   certificate of appealability may issue only "if the applicant has made a substantial showing of the

28   ////

1  denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The certificate of appealability must

2  "indicate which specific issue or issues satisfy" the requirement.  28 U.S.C. § 2253(c)(3).

3        A certificate of appealability should be granted for any issue that petitioner can

4  demonstrate is "'debatable among jurists of reason,'" could be resolved differently by a different

5  court, or is "'adequate to deserve encouragement to proceed further.'" <u>Jennings v. Woodford</u>, 290

6  F.3d 1006, 1010 (9th Cir. 2002) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983)).[10]

7        Petitioner has made a substantial showing of the denial of a constitutional right in the

8  following issue(s) presented in the instant petition: Claim 1, not because the issue is in doubt

9  under present law, but because higher courts may desire to issue a definitive opinion on the

10 admission of propensity evidence in general as stating a federal claim, and specifically in cases

11 involving sexual assault and domestic abuse; and Claim 3.

12 *Conclusion*

13       Accordingly, IT IS HEREBY RECOMMENDED that:

14       1.  The petition for writ of habeas corpus (ECF No. 1) be denied; and

15       2.  The District Court issue a certificate of appealability as to Claim 1 (The Use of Abuse

16 Propensity Evidence) and Claim 3 (The Consciousness of Guilt Instruction Violated Due Process

17 Because There Was No Evidentiary Link of Evidence Manipulation by Petitioner).

18       These findings and recommendations are submitted to the United States District Judge

19 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

20 after being served with these findings and recommendations, any party may file written

21 objections with the court and serve a copy on all parties.  Such a document should be captioned

22 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

23 ////

24 ////

25 ////

26 ─────────────────────

27 [10] Except for the requirement that appealable issues be specifically identified, the standard for
issuance of a certificate of appealability is the same as the standard that applied to issuance of a
certificate of probable cause.  <u>Jennings</u>, at 1010.

28

1   shall be served and filed within fourteen days after service of the objections.  The parties are

2   advised that failure to file objections within the specified time may waive the right to appeal the

3   District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

4   DATED: October 27, 2020

5                                    <u>/s/ Gregory G. Hollows</u>
                                UNITED STATES MAGISTRATE JUDGE